833 A.2d 54

Tylance BELTON,

v.

STATE of Maryland.

No. 2078, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Oct. 6, 2003.

Carrie S. Leonetti, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee

Argued before DAVIS, HOLLANDER, KENNEY, JJ.

KENNEY, Judge.

A jury sitting in the Circuit Court for Baltimore City convicted Tylance Belton, appellant, of various offenses arising out of a shooting and robbery with a dangerous weapon. Appellant noted a timely appeal and presents three questions for our review, which we have slightly re-worded:

I.  Did the trial court err in admitting into evidence an audiotape statement, given by Thomas to police, as a prior inconsistent statement or as an extrajudicial identification?

II.  Did the trial court err in finding that appellant's counsel properly informed appellant of his right against self-incrimination?

III.  Was the evidence legally sufficient to establish appellant's criminal agency?

For the reasons stated below, we answer "no" to the first two questions and "yes" to the third question.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 3, 2002, at about 11:30 p.m., Howard Thomas drove with his girlfriend to the 700 block of Carey Street to buy marijuana from appellant. After purchasing the marijuana and while returning to his car, Thomas was robbed at gunpoint and shot in the chest. Thomas returned to his car and drove to the University of Maryland Hospital, where he was transferred to the Shock Trauma Unit.

The hospital reported the incident to the police, who arrived in the early morning of March 4, 2002, to investigate. Thomas, who was being treated for his injuries, could not be interviewed at that time, but the police interviewed his girl-

friend and learned the location of the crime. Officers were dispatched to Carey Street, but no evidence was recovered and no witnesses were found. The next morning, Detective Donald Bauer recovered one nine millimeter shell casing on the corner of Lanvale and Carey Streets. No other evidence was found at the site.

On March 5, 2002, the police interviewed Thomas at the hospital. Detective Bauer asked Thomas if he knew who shot him. Thomas replied that the shooter was a "person he used to hang out with on the block," nicknamed "Ty or Tray." Thomas explained that "he had known [Tray] for approximately two years" and that his cousin had gone to school with "Tray." Thomas could not remember "Tray's" full name but promised to get in contact with his cousin and inform the detective. On March 7, 2003, when Detective Bauer again visited the hospital, Thomas told him that Tylance Belton was the name of the man who shot him.

Soon thereafter, the officers compiled a photo array of "six black males similar to the suspect," and presented it to Thomas. Thomas immediately identified appellant from the photo array as the person who had shot him. Thomas signed the photo array above appellant's picture, indicating he was his assailant, and wrote on the back: "I know Tre by a family member and on 3/3/02 at 11:30 p.m. he shot me in my chest and took 300 dollars from me."

Appellant was arrested on March 27, 2002. A search and seizure warrant was executed for appellant's home, but no weapon or other evidence was recovered.

On April 2, 2002, Thomas was asked to provide a taped statement of his identification. In the statement, Thomas identified appellant as his shooter, and when presented with a copy of the original photo array he again identified appellant.

On April 18, 2002, a grand jury indicted appellant for attempted first and second degree murder; first and second degree assault; reckless endangerment; robbery with a dangerous weapon; robbery; two counts of use of a handgun in the commission of a felony or crime of violence; wearing,

carrying, and transporting a handgun; and possession of a handgun after a predicate felony.

On October 7, 2002, a jury trial was held. At trial, Thomas testified that, on March 3, 2002, he was shot while buying marijuana in the 700 block of Carey Street. He recanted, however, his original identification of appellant, stating that now he believed Mark Bates was the shooter. Thomas explained that he had originally identified appellant "[b]ecause, at that time, I'm thinking it was Tylance that shot me...." Thomas stated that he had known Bates for "two years, at the most," and that he was "another guy that was around in our neighborhood." Thomas testified why he had changed his mind as to the identity of his shooter:

> Because by then, by listening to everybody on the streets that was, you know—like I said, this had went farther, before I had got shot. We were shooting dice at one point in time. Me and Tylance had a few words where, you know, everybody thought that we was beefing. You see what I'm saying? So when I got shot, like I told you, when I got the weed from Tylance, he went around on Harlem. You see what I'm saying? When I was going away—I mean, away from him, he was going about his business, I'm going about mine. I'm going back to my car. Like I said, the guy tapped me on my shoulder and then he had a hood on his head. The first thing I'm thinking is that it's him. He was about Tylance's height and everything. But the guy Mark came to me [while in the Baltimore City Detention Center] and told me that he was the one that really did it....

Thomas continued to explain that he originally had thought the shooter was appellant and did not change his mind until Bates confessed.

> Yeah, honestly, deep in my heart, yeah, I thought [Tylance was the shooter], 'cause that was the only person that I really had some type of—you know what I mean, like, actually, words against. That's why I said that it had to have been [him].

Thomas testified that the only person he told about Bates's confession was his mother. She told him to "pray about it and do the right thing." Thomas never called the state's attorney or told anyone at the Baltimore City Detention Center that he had changed his mind and no longer thought appellant shot him.

The State then called Detective Bauer to the stand. Detective Bauer testified that, in a taped statement, Thomas had indeed identified appellant as his shooter. When the State attempted to offer the tape into evidence, appellant's counsel objected because "the witness didn't deny that he made the [earlier] statement" identifying appellant as the shooter. The court overruled the objection based on Maryland Rule 5–802.1, which provides for the inclusion of inconsistent statements as substantive evidence, and the tape was played for the jury. Included on the tape was Thomas's identification of appellant from the photo array and the following statement, in pertinent part:

On March the 3rd around 11 o'clock, I had went up on Lanvale and Carey to go cop some weed, and as I got out the van that I had, I approached two other friends that I knew. One was Tylance.... And I had got some weed from them and everything, and as I was leaving, Tylance had pulled out the gun and asked me for the weed and my money. I thought he was playing, as he was waving it around in my face, and I was trying to walk off, but by the time I walked off, he shot me in my chest. I fell to the ground, and he came over the top of me, went in my pockets, took my money, took his weed back, and just left me lying there.

Detective Bauer testified that it was not until the morning of October 5, 2002, just two days before trial, that Thomas called and told him that "Tylance was not the person that shot [me]." Thomas told him the "real" shooter and appellant had similar descriptions, but Thomas did not provide Detective Bauer with Mark Bates's name. Finally, the detective explained that, upon conferring with the prosecutor, it was decided that no investigation would be made into Thomas's

accusation that it was someone else, and not appellant, who shot him. The State then rested.

During a bench conference, appellant's attorney advised appellant, on the record, concerning his right to testify. Appellant's attorney then requested a brief recess in order to discuss the matter with appellant. After a short recess, appellant elected not to testify and presented no evidence.

The jury convicted appellant of attempted second degree murder; first and second degree assault; reckless endangerment; wearing, carrying, and transporting a handgun; possession of a handgun after a predicate felony; robbery with a dangerous weapon; robbery; and two counts of use of a handgun in a crime of violence. The court merged the following convictions: first and second degree assault and reckless endangerment with attempted second degree murder; wearing, carrying and transporting a handgun with possession of a handgun after a predicate felony; and, one count of use of a handgun in a crime of violence with robbery with a dangerous weapon. Appellant received the following sentence: thirty years for attempted second degree murder; twenty years for the use of a handgun in the commission of a crime of violence, to run concurrently with the sentence for attempted second degree murder; five years for possession of a handgun after a predicate felony, to run concurrently with the sentences for attempted second degree murder and use of a handgun in the commission of a crime of violence; and a term of imprisonment of twenty years for robbery with a dangerous weapon, to run consecutively to the other sentences. On October 17, 2002, appellant timely noted this appeal.

## Discussion

### I.

The parties agree that Thomas's audiotape statement is hearsay.[1] Appellant argues that the trial court erred in

---

1. Md. Rule 5–801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

admitting the statement into evidence because it did not qualify under any exception to the hearsay rule. First, appellant contends that the recorded statement does not constitute a prior inconsistent statement because it was not inconsistent with Thomas's trial testimony. Second, appellant claims the statement does not qualify as an extrajudicial identification because it consisted of "far more than a mere identification of appellant."

### Prior Inconsistent Statement

Md. Rule 5–802.1 provides, in pertinent part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement;

The rule reflects a modified modern approach developed by the Court of Appeals in *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993). The *Nance* Court explained:

As the earlier statement is always nearer—and often much nearer—to the event in question, the memory is fresher, and the statement is likely to be more complete and more accurate. Second, the modern rule eliminates the need for a limiting instruction which asks jurors to carry out the difficult task of separating substantive proof from impeachment evidence bearing solely on a witness's credibility.

*Id.* at 566, 629 A.2d 633 (citing 2 McCormick on Evidence, § 251 at 119–20 (4th ed.1992)).

Maryland courts have recognized that witnesses can be victim to memory loss and outside pressures, which may later affect their testimony. *See Corbett v. State*, 130 Md.App. 408,

421, 746 A.2d 954 (2000) (suggesting that victims may change their prospective testimony because of loss of memory, selective amnesia, or untruthfulness). In such instances, and under the circumstances set forth in Md. Rule 5–802.1, statements made prior to trial can have probative value.

■  Here, the requirements of Rule 5–802.1 are satisfied. Thomas testified at trial and was available for cross-examination. He made a statement to the police prior to trial that was tape recorded "in a substantially verbatim fashion."

Furthermore, and contrary to appellant's contention, his recorded statement to the police was inconsistent with his trial testimony. In the earlier statement, Thomas told Detective Bauer that Tylance Belton was the shooter and identified appellant's picture in a photo array. At trial, Thomas testified that, although he originally thought Belton was the shooter, he was mistaken; based upon the alleged confession of Mark Bates, Thomas now believed that Bates was his shooter.

■  Black's Law Dictionary defines a prior inconsistent statement as "[a] witness's earlier statement that conflicts with the witness's testimony at trial." BLACK'S LAW DICTIONARY 1212 (7th ed.1999). A witness's motive or reason for changing his testimony is not relevant to whether a statement is inconsistent. See Nance, 331 Md. at 569, 629 A.2d 633 (suggesting that the gravamen of admitting a prior inconsistent statement is tri-fold: that the declarant testify about personal knowledge of the facts, that the statement be reduced to writing, and that the declarant be subject to cross-examination). Thomas's earlier identification of appellant as the shooter was inconsistent with his trial testimony that Bates shot him. Recognition or acknowledgment by the witness of the inconsistency in the prior statement, and explanation of it, does not render the prior statement consistent with the present testimony.

### Prior Extrajudicial Identification

■  Thomas's recorded statement was also admissible under the extrajudicial identification exception to the hearsay rule. Rule 5–802.1 states, in pertinent part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

\* \* \*

(c) A statement that is one of identification of a person made after perceiving the person;

In *Joiner v. State,* 82 Md.App. 282, 287, 571 A.2d 844 (1990), we quoted 6 MCLAIN, MARYLAND EVIDENCE § 801(3).1:

Under Maryland case law, proof of a prior identification of the accused as the perpetrator of an alleged crime is admissible as substantive evidence, under an exception to the hearsay rule, if the person who made the identification is in attendance and available for cross-examination and the identification was made under circumstances preventing unfair suggestion or confusion.

Appellant does not contend that the identification was made under circumstances previously unfair, suggestive, or confusing.

Appellant, however, contends that the circuit court exceeded its authority by playing "the entire six minute tape" to the jury, "which contained, in addition to the extrajudicial identification, a detailed description of the events of the alleged crime, the statements alleged to have been [made] to Mr. Thomas by appellant, and the length of Mr. Thomas and appellant's acquaintanceship." Essentially, appellant argues that only the identification portion of the statement, "Belton was the shooter," should have been admitted. In making this argument, appellant relies on *Mouzone v. State,* 294 Md. 692, 702, 452 A.2d 661 (1982), for the principle that when the extrajudicial identification contains "too much" additional information it is inadmissible.

*Mouzone,* however, was overruled in *Nance v. State,* 331 Md. 549, 569, 629 A.2d 633 (1993) (citation omitted):

We hold that the factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as

substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced. To the extent it is inconsistent with this holding, our opinion in *Mouzone v. State* ... is overruled.

■ Moreover, after the circuit court overruled appellant's general objection to admission of the tape, appellant did not request a redaction or limitation of the portion of the tape to be played to the jury. Appellant contended at oral argument that it was the State's obligation to limit or redact portions of the tape that exceeded Thomas's identification. This contention is without merit, for it is the obligation of the party seeking redaction to raise the issue to the judge. *See* JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK 20 (3d.1999) (stating: "If your objection gets overruled, request that the trial judge exclude specific portions which could easily be redacted. If the admission of minute details would create unfair prejudice, those details should be excluded."). The trial court did not err in admitting Thomas's audiotaped statement.

## II.

Next, appellant claims that his election not to testify was ineffective because he was not properly advised of his right to remain silent. In his brief, appellant contends that when his counsel advised him that he would "*ask* the Court to instruct the jury that they can't consider, they can't even talk about your silence in determining your guilt or innocence in this matter," he understood that "such *request* would be in the province of the trial court to deny." The State argues that appellant properly elected to waive his right, and the court had no obligation to intervene.

■ The right to testify on one's own behalf is guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Likewise, the right against self-

incrimination is constitutionally protected.[2] These rights are personal and must be knowingly and intelligently waived. *See Rock v. Arkansas,* 483 U.S. 44, 51–52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (stating that the Fourteenth Amendment gives a defendant the "right . . . to choose between silence and testifying in his own behalf"; the Sixth Amendment provides the defendant the "right to call 'witnesses in his favor' "; and the Fifth Amendment gives the defendant " 'the privilege against self-incrimination' " and the " 'choice of whether to testify in one's own defense . . . is an exercise of the constitutional privilege' " (citations omitted)); *Martinez v. State,* 309 Md. 124, 133–34, 522 A.2d 950 (1987). Moreover, the jury may not draw any adverse inference from the defendant's election not to testify, and a defendant is entitled to a jury instruction explaining as much. *Gray v. State,* 368 Md. 529, 602, 796 A.2d 697 (2002); MARYLAND CRIMINAL PATTERN JURY INSTRUCTIONS, 3:17.

It is a defense attorney's responsibility to explain these rights to his client. This Court has said that the trial court "may generally assume" that a represented defendant has been informed by his counsel of his constitutional rights. Hamilton v. State, 79 Md.App. 140, 143, 555 A.2d 1089 (1989). The Court of Appeals has said that a trial court can presume that a represented defendant has been informed of and understands his rights. *Gilliam v. State,* 320 Md. 637, 652–53, 579 A.2d 744 (1990). In *Stevens v. State,* 232 Md. 33, 39, 192 A.2d 73 (1963), the Court, in reference to the right to testify and the right against self-incrimination, stated:

Most jurisdictions which have considered the point have held that failure by a trial court to advise a defendant not represented by counsel of his right to refuse to take the

---

**2.** The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." The Fifth Amendment is made applicable to the states through the Fourteenth Amendment. *See Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (stating that the Fifth Amendment right against self-incrimination is made applicable to the states through the Fourteenth Amendment).

witness stand constitutes prejudicial error. However, we do not deem it essential for the protection of a defendant's constitutional rights that he be advised by the court of his right against self-incrimination when he is represented by counsel. [Citations omitted.]

Indeed, only

'where it becomes clear to the trial court that the defendant does not understand the significance of his election not to testify or the inferences to be drawn therefrom and where the presumption is rebutted must the court advise the accused of his right to testify or to remain silent.'

*Tilghman v. State,* 117 Md.App. 542, 556, 701 A.2d 847 (1997) (quoting *Gilliam,* 320 Md. at 652–53, 579 A.2d 744).

During a bench conference, appellant's attorney advised appellant, on the record, concerning his right to testify, as evidenced by the following colloquy.

[Appellant's Attorney]: Okay. Mr. Belton, you have an absolute right to testify in this matter. You can get on the stand and you can tell the jury anything you'd like for them to consider or your side of the story. You also have an absolute right not to testify, and *if you choose not to testify, I will ask the Court to instruct the jury that they can't consider, they can't even talk about your silence* in determining your guilt or innocence in this matter. Do you understand that? [Emphasis added.]

[Appellant]: Yes.

[Appellant's Attorney]: Would you like to consult with me with regard to whether you're going to testify in this matter or not?

[Appellant]: (Unintelligible).

[Appellant's Attorney]: You wish to consult with me for a few moments, correct?

[Appellant]: That's right.

[Appellant's Attorney]: May we make our decision after the break?

THE COURT: You understand what your rights are?

[Appellant]: Yes, sir.

Following a short recess, appellant's attorney stated, "Your Honor, I advised Mr. Belton of his rights at the bench. He chooses not to testify and invoke his Fifth Amendment right." The trial judge appropriately instructed the jury as follows:

In a criminal case, it is the right and privilege of a Defendant not to testify. Therefore, you should draw no conclusion one way or the other from the fact that the Defendant did not testify. You must base your decisions in this case only upon the evidence and all of the evidence that you've seen and heard during the course of the trial and any conclusions that may fairly and reasonably be drawn from the evidence.

Both the attorney and the trial judge asked appellant if he understood his rights. On both occasions, appellant replied in the affirmative. In addition, the circuit court properly instructed the jurors that they could draw no negative inference from appellant's decision not to testify. We perceive no error.

### III.

Finally, appellant claims that the evidence presented was insufficient to sustain any of his convictions. He argues that Thomas's "unequivocal retraction of his pretrial identification of appellant as the person who shot him" leaves no possibility for a "rational trier of fact [to reach] the verdict of guilty in this case." The State counters that the "testimony of a single eyewitness is sufficient to convict," and therefore Thomas's identification testimony alone is enough to uphold appellant's conviction.

In reviewing appellant's claim of insufficiency of the evidence, this Court does not "undertake a review of the record that would amount to, in essence, a retrial of the case." *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336, 337 (1994) (*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, (1979)). Rather, an appellate court reviews the

evidence in the light most favorable to the prevailing party below; in this case, the State. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Albrecht,* 336 Md. at 478, 649 A.2d 336.

"[W]e accord deference to the factual findings of the jury and recognize its ability to observe the demeanor of the witnesses and to assess their credibility." *Streater v. State,* 119 Md.App. 267, 275, 704 A.2d 541 (1998), *rev'd on other grounds,* 352 Md. 800, 724 A.2d 111 (1999). So long as we find that "any rational trier of fact could have found the elements of the crime beyond a reasonable doubt, the appellant's conviction must be upheld." *Cooper v. State,* 128 Md. App. 257, 266, 737 A.2d 613, 617 (1999) (citing Jackson, 443 U.S. at 319, 99 S.Ct. 2781).

Appellant argues that *Gibbs v. State,* 7 Md.App. 35, 253 A.2d 446 (1969), is controlling and requires that we overturn appellant's conviction. There, the victim of an attempted robbery identified his robber to the police and then later at trial recanted, stating that his previous identification had been incorrect. The *Gibbs* Court, in what was essentially a credibility determination by the Court, determined that the victim's testimony that the defendant was not the robber "completely dissipated" the evidentiary value of his extrajudicial identification. *Id.* at 39, 253 A.2d 446.

*Gibbs* is factually different than this case. The victim in *Gibbs* based his belief that Gibbs was not the robber on having "seen him right good" and knowing "him better now today." *Id.* at 37–38, 253 A.2d 446. Thomas, on the other hand, attributes his change of mind to the alleged confession of Bates.

More importantly, however, is the reshaping of the evidentiary landscape by *Nance* and Md. Rule 5–802.1 since this Court's decision in *Gibbs.* Inconsistent extrajudicial statements are now admitted as substantive evidence. As a result, the jury has the responsibility of weighing the evidence and the credibility of the witnesses. As was discussed in *Thomas v. State,* 113 Md.App. 1, 13, 686 A.2d 676 (1996):

In *Gibbs,* the Court of Special Appeals made a determination based on the record that the witness's statements at trial were more credible than his extra-judicial identification. Of course, Rule 5–802.1, in allowing inconsistent extra-judicial statements into court so long as the witness is available for cross-examination, necessarily requires that a trier of fact make a determination as to whether the in-trial statement or the extra-judicial statement of a given witness is more credible.

\* \* \*

Thus, in the case of inconsistent extra-judicial statements, the trier of fact must make a determination based on the witness demeanor and other circumstances as to whether the inconsistent extrajudicial statements or the witness's statements at trial are more credible. As appellee noted, appellant, in relying on *Gibbs* . . . is asking this Court to overturn a jury's determination as to the credibility of witnesses, although the situation is unusual in that the determination actually being made is as to whether the witness's statements at trial or his prior inconsistent statements are to be believed.

█ We believe that *Gibbs* has been effectively overruled by the Rule.[3] The jury in this case, as the trier of fact, had the right to reject totally Thomas's in-trial testimony in favor of his earlier extra-judicial statement. It obviously did so. The earlier identification of appellant as the assailant, if believed, was sufficient to establish beyond a reasonable doubt his agency in the crimes for which he was convicted. We are not prepared to say that no rational trier of fact could have reached such a verdict.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**3.** Since the Rule's revision in 1994, *Gibbs* has only been cited in Maryland in *Thomas.*