993 A.2d 1141

**Andre MARLIN a/k/a Kendrick Martin**

v.

**STATE of Maryland.**

**No. 1032 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

April 30, 2010.

George E. Burns, Jr. (Elizabeth L. Julian, Acting Public Defender, on the brief), Baltimore, MD, for Appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, WOODWARD and KEHOE, JJ.

**140**

HOLLANDER, Judge.

Andre Marlin, a/k/a Kendrick Martin, appellant, appeared in the Circuit Court for Baltimore City on charges of attempted first degree murder and related offenses. Following a bench trial, the court found appellant guilty of first degree assault; use of a handgun in the commission of a crime of violence; reckless endangerment, and related offenses.[1] The court sentenced appellant to 10 years' incarceration for first degree assault; a concurrent sentence of 5 years in prison, without the possibility of parole, for the handgun conviction; and a concurrent term of 5 years for reckless endangerment. The remaining convictions were merged for sentencing.

On appeal, appellant presents the following questions for our review:

I. Was appellant improperly convicted on the basis of unsworn statements?

II. Did the trial court err in not merging reckless endangerment with first degree assault?

For the reasons set forth below, we shall vacate the sentence for reckless endangerment, but otherwise affirm the judgments.

### FACTUAL BACKGROUND

This case arises from events that occurred on January 4, 2006, when Derrick Williams was shot in the back. Detectives Ryan Guinn and Shawn Reichenberg were among the police officers who responded to the scene of the shooting. Williams was transported to the hospital by ambulance. Later that evening, after Williams was released, he was brought to the police station to make a statement. Because Williams was

---

1. Appellant was also convicted of second degree assault; wearing, carrying, or transporting a handgun; possession of a handgun after conviction of a disqualifying offense; and discharging a handgun in Baltimore City. The State entered a nolle prosequi as to attempted first and second degree murder.

"incoherent from the medication," however, Detective Guinn sent him home.

Williams contacted Detective Guinn on January 5, 2006, and provided a statement that day. He told Detectives Guinn and Reichenberg that appellant was the person who shot him. Thereafter, Williams was shown a photographic array containing photos of six men, including appellant. According to the officers, Williams immediately identified appellant as the shooter. On the back of the sheet of photographs, Williams wrote: "This is the guy who shot me. However, I am not going to Court, and if I do I am not going to said [sic] nothing."

Williams also provided a recorded statement, in which he again identified appellant as the shooter. But, Williams also stated: "If I go to court, if you all was to arrest Mr. Martin, I'm going to say that he ain't do it and I don't know nothing."

Detective Guinn conceded that, apart from Williams's statements implicating appellant, no other evidence led to appellant as the shooter. The following colloquy occurred on cross-examination:

[DEFENSE ATTORNEY]: So, you really don't know exactly who shot this gentleman, Derrick Williams, do you?

[DETECTIVE GUINN]: No.

Williams testified that at about 7:45 p.m. on January 4, 2006, while he was trying to buy drugs, he was shot in the back. But, Williams claimed that he did not "remember" who shot him. He also testified that he did not "know" appellant, although he might have seen him in "passing." Williams identified his signature and handwriting on the back of the photo array, but he had no recollection of making any statements to the police. Williams explained that, at the time he was shot and when he spoke to the detectives, he was "strung out, real strung out" on cocaine, heroin, and alcohol, and was "out of it."

The following colloquy occurred on cross-examination:

[DEFENSE ATTORNEY]: So, under oath here today, sir, did Kendrick Martin shoot you?

[WILLIAMS]: I don't remember.

[DEFENSE ATTORNEY]: Okay.

[WILLIAMS]: I don't remember who shot me.

[DEFENSE ATTORNEY]: So, you—so you can't say it was Kendrick Martin.

[WILLIAMS]: I was—I was—

[DEFENSE ATTORNEY]: Is that fair to say?

[WILLIAMS]: I think it's fair to say. I was so high at that time I couldn't even see my own hand in front of my face.

Detective Reichenberg testified after Williams. In addition to the evidence discussed earlier, he claimed that Williams said he had been drinking, "but he didn't say he was high," despite having been asked that question. Moreover, the detective denied that Williams said he was shot while trying to buy drugs. Nevertheless, Detective Reichenberg conceded Williams's pretrial statements were the only evidence against Mr. Martin.

Williams's medical records were admitted by stipulation. They established that he suffered a gunshot wound on the date in question. The defense did not call any witnesses.

In closing argument, the prosecutor stated, in part:

The State does feel that this is a first degree assault case, at a minimum, due to the injuries of the victim.

\* \* \*

Your Honor, he made it very clear that Kendrick Martin is the man who shot him. . . .

\* \* \*

So, I think, Your Honor, that it is a first degree assault. He does identify him. He picks him out in a photo array and says: "This is the guy who shot me." Given the nature of his injuries, he was shot in the back area, which could have paralyzed him, quite honestly. . . .

In response, the defense attorney said, in part: "I do not think that they've met their burden in any counts." Further, he argued:

[The police] don't ask [Williams] why he was out there. They don't even ask him why there would be any motivation for this young man to shoot him, whatsoever. They don't have any other witnesses whatsoever to point to Kendrick Martin. The only thing they have, Your Honor, is a witness who states very clearly that he was high both, at the time he was shot, and at the time in which he gave a statement.

In rendering judgment, the trial judge said, in part:

Here's the problem for me, from the—looking at [t]he defense side of this case, is I generally tend to believe what a person says the first time is the truth. All the other nonsense that they come up with at a later date is for some ulterior motive.

Here we have a guy who actually tells us in advance what he's going to do on the stand. And, then, true to his word he comes in here and does it. I believe the first version. I find the defendant guilty beyond a reasonable doubt of first degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence.

Having said that, I also feel some sympathy for the defendant, because I get the sense there's more going on between these two guys. There's something else happening here which nobody is telling me, right? And, I wouldn't be amazed at all if he didn't—he had no reason to shoot this guy, it was in the context of something else going on, and this guy may have been the poor fool standing there at the moment.

The court proceeded to sentencing.[2] The defense attorney did not ask the court to merge any of the offenses for sentencing purposes.

Additional facts will be provided as necessary to the discussion of the issues.

---

2. In his allocution, appellant insisted that he was innocent.

## DISCUSSION

### I.

Appellant contends that he "was improperly convicted on the basis of unsworn statements." However, he does not directly challenge the admission of Williams's pretrial statements as substantive evidence.

The State casts its response in terms of sufficiency of the evidence and relies on the admissibility of Williams's prior inconsistent statements as substantive evidence. It asserts: "The evidence was sufficient to sustain Marlin's convictions where the trial court admitted, without any objection from defense counsel, the victim's prior inconsistent statement identifying Marlin as the person who shot him on January 4, 2006."

According to the State, appellant has waived his complaint, because he failed to object to the admission of Williams's pretrial statements, which were offered as substantive evidence. Alternatively, even if preserved, the State maintains that Williams's statements were properly admitted to prove appellant's criminal agency.

■ Preliminarily, with respect to any underlying challenge to the admission of Williams's pretrial statements, we agree with the State's waiver contention, because appellant failed to object to the admission of the statements as substantive evidence. To the contrary, appellant's counsel affirmatively noted that he had no objection. *See* Md. Rule 4–323(a) (stating that objections to evidence must be made as soon as the challenged evidence is offered or as soon as the grounds for objection become apparent); Md. Rule 8–131(a) (providing that the appellate court will not ordinarily address issues not raised in or decided by the trial court).

■ Alternatively, the statements were properly admitted as prior inconsistent statements, in accordance with the landmark case of *Nance v. State,* 331 Md. 549, 560–61, 629 A.2d 633 (1993) and Maryland Rule 5–802.1. We explain.

In *Nance,* the Court of Appeals "carved out an important exception to the general rule against the admissibility of prior inconsistent statements as substantive evidence." *Stewart v. State,* 342 Md. 230, 237, 674 A.2d 944 (1996) (explaining *Nance*). Departing from the longstanding prohibition against use of a witness's prior inconsistent statement as substantive evidence, the Court opted for a limited version of the "modern rule," permitting prior inconsistent statements signed or adopted by the declarant to be admitted as probative evidence so long as the declarant is available for cross-examination at trial. *Nance,* 331 Md. at 565, 569, 629 A.2d 633. The *Nance* Court held, *inter alia,* that the factual portion of a witness's prior signed statement is admissible at trial as substantive evidence when inconsistent with the witness's in-court testimony, so long as the witness is subject to cross-examination concerning the statement. *Id.* at 570–71, 629 A.2d 633; *see Tyler v. State,* 342 Md. 766, 775, 679 A.2d 1127 (1996); *Stewart,* 342 Md. at 237, 674 A.2d 944; *Makell v. State,* 104 Md.App. 334, 339, 656 A.2d 348 (1995). Moreover, it ruled that "a court may admit, as substantive proof, evidence of a third party testifying as to an extrajudicial identification by an eyewitness when made under circumstances precluding the suspicion of unfairness or unreliability, where the out-of-court declarant is present at trial and subject to cross-examination." *Nance,* 331 Md. at 560, 629 A.2d 633.

Maryland Rule 5–802.1 subsequently codified the *Nance* decision. It provides, in part:

**Rule 5–802.1. Hearsay exceptions—Prior statements by witnesses.**

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially

verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement;

* * *

(c) A statement that is one of identification of a person made after perceiving the person;

In this case, Detective Guinn recounted the circumstances of William's signature and written statement on the back of the photo array, in which Williams indicated that appellant was the man who shot him. The photo array was later admitted, without objection. Detective Guinn also discussed the audio recording provided by Williams on January 5, 2006, which the State subsequently played during Williams's testimony. The recorded statement was also admitted into evidence, without objection. Detective Guinn's testimony was corroborated by Detective Reichenberg.

Williams was called by the State, and took an oath to tell the truth. As noted, he testified on direct examination in a manner that was inconsistent with his prior statements to the police. He was then subject to cross-examination.

In particular, Williams said that he did not remember who shot him, and that he did not know appellant. Yet, in Williams's first pretrial statement to the police, he named appellant as his assailant. He was then shown appellant's picture in a photo array and identified appellant as the person who shot him. Clearly, Williams's first statement of identification was inconsistent with his trial testimony. Therefore, it was admissible as substantive evidence under *Nance* and Maryland Rule 5-802.1(c). Similarly, in Williams's second pretrial statement to the police, an audio recording, he again implicated appellant with respect to the events of January 4, 2006. That statement was also inconsistent with Williams's trial testimony. As a verbatim recording, it was admissible under Maryland Rule 5-802.1(a)(3).

Our view as to admissibility is not altered merely because the State knew ahead of time that Williams would not implicate appellant at trial. *See Stewart*, 342 Md. at 240-44, 674 A.2d 944 (holding that the prior inconsistent statement of a

witness was admissible even though the prosecution knew in advance that the witness intended to repudiate his prior statement). The pretrial statements were also admissible, despite Williams's claim that he was under the influence of drugs when he made them. *See Nance, supra,* 331 Md. at 573, 629 A.2d 633 (admitting pretrial statement of witness who claimed to have been intoxicated by drugs at the time the statement was made); *Makell,* 104 Md.App. at 339, 346–48, 656 A.2d 348 (admitting pretrial identification of the sole witness who claimed a total loss of memory at trial due to his "continuous multi-year drug stupor.")

In sum, Williams's pretrial identifications of appellant in the photo array and in his recorded statement (State's Exhibits 4 and 5, respectively) met the requirements of *Nance* and Rule 5–802.1. Therefore, they were properly admitted as substantive evidence of appellant's criminal agency.

## II.

■ We turn to consider appellant's contention that Williams's unsworn pretrial statements were the only evidence admitted at trial to prove appellant's criminal agency, and therefore appellant was wrongfully convicted on the basis of unsworn statements. In particular, appellant contends that because Williams testified that he was unable to remember the events of January 4, 2006, the only evidence of appellant's culpability was contained in the unsworn written and recorded statements that Williams gave to the police on January 5, 2006.

Appellant posits:

Some jurisdictions have taken the position that a conviction cannot rest on prior inconsistent unsworn statements. . . . Other courts have unreflectively treated such statements or [sic] sufficient evidence. *State v. Mancine*[, 124 N.J. 232], 590 A.2d 1107 ([N.J.] 1991). A third intermediate position has been taken by some courts. Such a statement may be sufficient if it "is generally corroborated

and its reliability is supported by the circumstances under which it was given." *Id.* at 1117.

The latter approach is consistent with the Court of Appeals holding in *Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982).

According to appellant, his convictions cannot stand under *Bedford.* In our view, appellant's reliance on *Bedford* is misplaced.

In *Bedford,* an elderly couple who were returning to their home were confronted by a man who robbed and beat them and then ransacked their house. *Id.* at 173, 443 A.2d 78. The attacker remained in the victims' home for over an hour, and was within their sight for about half an hour. *Id.* at 173–74, 443 A.2d 78. After the attack, both victims participated in creating a composite sketch of the robber. *Id.* at 174, 443 A.2d 78. They also identified Bedford as their attacker from a photo array. *Id.* at 174, 443 A.2d 78. But, several months later, at a motions hearing, the victims were unable to identify Bedford. *Id.* at 174, 443 A.2d 78. They were not asked to attempt an identification in the presence of the jury at trial. *Id.* at 174, 443 A.2d 78. The jury found Bedford guilty of multiple offenses, including two counts of robbery with a deadly weapon and one count of daytime housebreaking. *Id.* at 173, 443 A.2d 78.

On appeal, Bedford asserted that the victims' extrajudicial identification, which was not confirmed by an identification at trial, and which lacked corroborating evidence, was insufficient to sustain his conviction. *Bedford* considered the decision of the Supreme Court of California in *People v. Gould,* 54 Cal.2d 621, 7 Cal.Rptr. 273, 354 P.2d 865 (1960).[3] Quoting *Gould,* 7 Cal.Rptr. 273, 354 P.2d at 867 (internal citations omitted), the *Bedford* Court stated, 293 Md. at 177–78, 443 A.2d 78:

---

**3.** *Gould* was superseded by statute. *See* CAL. EVID.CODE § 411 (1965); *see also People v. Cuevas,* 12 Cal.4th 252, 48 Cal.Rptr.2d 135, 906 P.2d 1290 (1995).

"Evidence of an extrajudicial [photographic] identification is admissible, not only to corroborate an identification made at the trial, but as independent evidence of identity. Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached, evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. The failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances. The extrajudicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination."

The *Gould* Court concluded, however, that an extrajudicial photographic identification, *standing alone,* was insufficient evidence of criminal agency to justify a conviction. *Gould* said, 7 Cal.Rptr. 273, 354 P.2d at 870: "An extra-judicial identification that cannot be confirmed by an identification at the trial is insufficient to sustain a conviction in the absence of other evidence tending to connect the defendant with the crime."

In a four to three decision, the Court of Appeals rejected Bedford's argument that Maryland should adopt a standard similar to that iterated in *Gould.* Indeed, the *Bedford* majority characterized *Gould* as "a puzzling case," 293 Md. at 180 n. 2, 443 A.2d 78, and observed, *id.* at 179, 443 A.2d 78: "*Gould* is the only decision of a court of last resort which either the parties or the Court have been able to locate holding that an extrajudicial photographic identification is insufficient evidence of criminal agency to warrant conviction."

Further, the Court noted that the holding in *Gould* had been previously considered and rejected by the Court of Special Appeals in *Cousins v. State,* 18 Md.App. 552, 556–59, 308 A.2d 692, *cert. denied,* 270 Md. 738 (1973). The *Bedford* Court also pointed to its own holding in *Johnson v. State,* 237 Md. 283, 206 A.2d 138 (1965), involving an identification at a line-up. In *Johnson,* the Court stated, *id.* at 291, 206 A.2d 138:

> We hold therefore that where, as here, the identifying victims or eyewitnesses were present and subject to cross-examination, the testimony of the police officer as to the extrajudicial identifications was admissible.
>
> Even where witnesses do not make a courtroom identification of the indictees, an extrajudicial identification is admissible as evidence over an objection that it is not the best evidence. *State v. Simmons,* 63 Wash.2d 17, 385 P.2d 389 (1963). We note that the *Simmons* case cited *Judy v. State,* [218 Md. 168, 146 A.2d 29 (1958)], for the proposition that the first identification is usually the best identification. For other cases that have admitted evidence of extrajudicial identifications even where no positive courtroom identification was made, see *People v. Gould,* 54 Cal.2d 621, 7 Cal.Rptr. 273, 354 P.2d 865 (1960) and *State v. Wilson,* 38 Wash.2d 593, 231 P.2d 288 (1951), *cert. den.* 342 U.S. 855, 72 S.Ct. 81, 96 L.Ed. 644 (1951) and 343 U.S. 950, 72 S.Ct. 1044, 96 L.Ed. 1352 (1952).

Thus, the *Bedford* majority held that "an extrajudicial photographic identification of an accused is sufficient evidence of his criminal agency to support a conviction, notwithstanding the fact that the victim may be unable to identify him at the time of trial." *Id.* at 185, 443 A.2d 78. Yet, according to appellant, "[t]here can be no doubt that *Bedford* stands on the border of sufficiency." [4]

---

4. In his dissent in *Bedford,* Judge Eldridge advocated adoption of the standards articulated in *Gould, supra.* He argued, *id.* at 188, 443 A.2d 78:

In support of his position, appellant notes that in *Bedford* the two pretrial identifications were made by witnesses who helped to create a composite of the assailant. "Of at least equal importance," asserts appellant, "was the fact that the good faith and integrity of the witnesses was never questioned." In his view, "[t]his case is far different. Williams immediately called into question his identification of Appellant when he said that he would not make an identification in court."

In addition, appellant contends that the case *sub judice* "represents the reverse of the situation presented in *Nance*," 331 Md. 549, 629 A.2d 633, in which "the Court was concerned with 'turncoat' witnesses and fairness to the State." Appellant elaborates:

> Williams was not a turncoat witness: from the outset he staked out his position that he would incriminate Appellant but not swear to anything. If he were afraid he would not have identified Appellant.... The more likely scenario is unfairness to the defendant by a victim who is afraid of the real culprit but shifts blame to another while never risking perjury.

Appellant overlooks that opinions assented to by a majority of the Court, unless subsequently overruled in another case or by statute, are the law, and must be followed by this Court. Therefore, despite appellant's preference for the dissent in *Bedford,* it does not constitute a binding precedent upon this Court. Moreover, the majority opinion in *Bedford* later served as a basis for the Court's decision in *Nance,* in which the Court said: "An extrajudicial identification is sufficient evidence of criminal agency to sustain a conviction, even though the declarant is unable to identify the accused at trial." *Nance,* 331 Md. at 561, 629 A.2d 633. Similarly, this Court

---

[W]hen the *only* evidence introduced to connect a defendant with a crime is testimony of a third party that the victims made an extrajudicial identification of a photograph of the accused, and claimed that it looked like the perpetrator, then there is necessarily a reasonable doubt whether the accused committed the crime, and his conviction should not be permitted to stand.

determined in *Belton v. State*, 152 Md.App. 623, 639, 833 A.2d 54, *cert. denied*, 378 Md. 617, 837 A.2d 928 (2003), that a prior inconsistent statement identifying an assailant was sufficient to sustain the defendant's convictions.[5] Thus, with some minor modifications, the majority opinion in *Bedford* has become solidly embedded in the law of Maryland.

Furthermore, while we do not dispute that the witnesses in *Bedford* were possessed of admirable qualities such as good faith and integrity, we do not agree that these qualities, or the lack thereof, were of primary importance, either in the majority opinion in *Bedford* or in subsequent cases. *See, e.g., Nance, supra*, 331 Md. at 557, 629 A.2d 633 (witness was a habitual drug user); *Makell*, 104 Md.App. at 346–48, 656 A.2d 348 (same). Indeed, we are unaware of any requirement that a person must have led a blameless life in order to qualify as a trial witness.

Appellant's reliance on *Dorsey v. State*, 356 Md. 324, 739 A.2d 41 (1999), to support his claim that he was improperly convicted solely on the basis of unsworn statements, is also unavailing. In *Dorsey*, the Court stated, *id.* at 353, 739 A.2d 41:

Except for cases tried on agreed statements of facts, defendants pleading not guilty " 'should not be allowed to be convicted on the basis of unsworn testimony.' " *Bradley v. State*, 333 Md. 593, 602 n. 4, 636 A.2d 999 (1994) (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975)). *See Bridges v. Wixon*, 326 U.S. 135, 153–54, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (to "allow men to be convicted on unsworn testimony of witnesses [is] a practice which runs counter to the notions of fairness on which our legal system is founded"); *United States v. Hawkins*, 76 F.3d 545, 550–51 (4th Cir.1996) (criminal contempt conviction vacated because

---

5. Similarly, evidence improperly admitted at a trial may be considered in evaluating the sufficiency of evidence on appeal. *Emory v. State*, 101 Md.App. 585, 629–30, 647 A.2d 1243 (1994) ("We measure ... legal sufficiency on the basis of all of the evidence in the case, that which was improperly admitted just as surely as that which was properly admitted."), *cert. denied*, 337 Md. 90, 651 A.2d 855 (1995).

trial judge relied on the unsworn "testimony" of an Assistant United States Attorney).

*Dorsey* involved two cases that were consolidated on appeal. Mr. Craft, one of the appellants, was tried for criminal contempt for failure to pay child support. At trial, however, no sworn testimony was taken. *Id.* at 353, 739 A.2d 41. Rather, Craft was convicted on the basis of a proffer from trial counsel and the unsworn statement of a child support enforcement agency representative. *Id.* at 337–40, 739 A.2d 41.

This case differs markedly from *Dorsey.* Williams's lack of recollection about his pretrial photo identification of Marlin and his prior recorded statement identifying Marlin as the person who shot him constituted prior inconsistent statements of Williams that were admissible under *Nance,* 331 Md. at 572–74, 629 A.2d 633, and Rule 5–802.1. Notably, two police witnesses also testified under oath and corroborated that Williams made the pretrial identifications that he was unable to recall at trial.

It is axiomatic that weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks properly assigned to the factfinder, *State v. Smith,* 374 Md. 527, 533–34, 823 A.2d 664 (2003), and shall not be undertaken by an appellate court upon review. *Owens v. State,* 170 Md.App. 35, 101–02, 906 A.2d 989 (2006), *aff'd,* 399 Md. 388, 924 A.2d 1072 (2007). Further, it is well established in Maryland that the testimony of even a single eyewitness, if believed, is sufficient evidence to support a conviction. *See, e.g., Walters v. State,* 242 Md. 235, 237–38, 218 A.2d 678 (1966) (stating that "[i]dentification by the victim is ample evidence to sustain a conviction"). *See also* Md. Rule 8–131(c).[6]

---

**6.** The rule states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

We readily conclude that the evidence was sufficient to convince a rational fact finder, beyond a reasonable doubt, that appellant was guilty of the crimes of which he was convicted.

## III.

Appellant contends: "The trial court erred in not merging reckless endangerment with first degree assault." In support of his position, appellant relies solely on *Williams v. State,* 100 Md.App. 468, 641 A.2d 990 (1994).[7]

Asserting that "Marlin is wrong," the State maintains that appellant's reliance on *Williams* is "misplaced." It points out that "first degree assault is a 'multi-purpose criminal statute,' as it may be proved by alternative theories," and suggests that, in analyzing the issue of merger, we must consider "the alternative elements relevant to the case."

We begin with a review of the relevant statutes. Section 3–201(b) of the Criminal Law ("C.L.") Article of the Md.Code (2002) defines "assault" as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." C.L. § 3–202 states, in part:

§ **3–202. Assault in the first degree.**

(a) *Prohibited.*—(1) A person may not intentionally cause or attempt to cause serious physical injury to another.

(2) A person may not commit an assault with a firearm . . . [8]

C.L. § 3–204 provides, in part:

**Reckless endangerment.**

---

**7.** In his brief, appellant devotes less than four lines to this issue. Moreover, he does not identify whether his merger claim is based on the required evidence test, the rule of lenity, or principles of fundamental fairness. In its brief, the State addressed both the required evidence test and the rule of lenity. However, it did not discuss principles of fundamental fairness.

**8.** C.L. § 3–203 governs second degree assault. It states, in part: "A person may not commit an assault." C.L. § 3–203(a).

(a) *Prohibited.*—A person may not recklessly:

(1) engage in conduct that creates a substantial risk of death or serious physical injury to another; or

(2) discharge a firearm from a motor vehicle in a manner that creates a substantial risk of death or serious physical injury to another.

■ The crime of reckless endangerment is "purely a statutory crime." *Holbrook v. State,* 364 Md. 354, 365, 772 A.2d 1240 (2001). It was first enacted in Maryland by 1989 Md. Laws, Ch. 469, and took effect on July 1, 1989. *Id.* It was initially codified in Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 120.[9] Effective October 1, 1996, the General Assembly repealed Art. 27, § 120 and enacted Art. 27, § 12A–2 of the Md.Code (1957, 1996 Repl.Vol.), within a new subtitle, "Assault." *Id.*[10] The text of Art. 27, § 12A–2(a)(1) contained the same text as that previously found in Art. 27, § 120. *Id.* at 366 n. 6, 772 A.2d 1240. As noted, the reckless endangerment statute is now found in C.L. § 3–204. As C.L. § 3–204(a)(1) reflects, that text is substantively the same as the predecessor statutes.

■ Reckless endangerment "is quintessentially an inchoate crime." *Williams,* 100 Md.App. at 480, 641 A.2d 990. It was "designed to punish potentially harmful conduct even

---

**9.** Art. 27, § 120(a) provided:

> Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

**10.** In *Christian v. State,* 405 Md. 306, 951 A.2d 832 (2008), the Court explained that in 1996 "the General Assembly changed the legal landscape with regard to the law of assault and battery, both statutory and common law. It repealed the various assault type provisions in Article 27, replacing them with §§ 12, 12A,[ ] and 12A–1. 1996 Laws, Chap. 632." *Id.* at 317–18, 951 A.2d 832. The Court added, *id.* at 328, 951 A.2d 832: "The 1996 legislative repeal of the prior assault provisions, and enactment of a new assault statute in Md.Code (1957, 1996 Repl. Vol.), Art. 27 § § 12, 12A, and 12A–11, represented a substantive change in the law of assault in Maryland."

under those fortuitous circumstances where no harm results." *Id. See State v. Pagotto,* 361 Md. 528, 549, 762 A.2d 97 (2000) (stating that the reckless endangerment statute is aimed at deterring the commission of potentially harmful conduct); *State v. Albrecht,* 336 Md. 475, 500–01, 649 A.2d 336 (1994) (recognizing that the reckless endangerment statute "is aimed at deterring the commission of potentially harmful conduct before an injury or death occurs"); *Minor v. State,* 326 Md. 436, 442, 605 A.2d 138 (1992) ("It is the reckless conduct and not the harm caused by the conduct, if any, which the statute was intended to criminalize"). The elements of the offense were set forth in *Jones v. State,* 357 Md. 408, 427, 745 A.2d 396 (2000): "(1) that the defendant is engaged in conduct that created a substantial risk of death or serious physical injury to another; and (2) that a reasonable person would not have engaged in that conduct; (3) that the defendant acted recklessly."

 For the crime of reckless endangerment, mens rea is determined on an objective basis. *See Jones,* 357 Md. at 427, 745 A.2d 396; *Minor,* 326 Md. at 443, 605 A.2d 138. In *Holbrook,* the Court explained, 364 Md. at 367, 772 A.2d 1240 (quoting *Pagotto,* 361 Md. at 549, 762 A.2d 97):

"[G]uilt under the statute does not depend upon whether the accused intended that his reckless conduct create a substantial risk of death or serious injury to another. The test is whether the appellant's misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish."

Writing for the Court in *Williams,* 100 Md.App. at 481, 641 A.2d 990, Judge Moylan explained: "At the *actus reus* level, [reckless endangerment] is one element short of consummated harm. At the *mens rea* level, it is one element short of the specific intent necessary for either an attempt or for one of the aggravated assaults." Further, he wrote, *id.* at 476–77, 641 A.2d 990:

To be guilty of reckless endangerment, the defendant must be shown to have possessed *nothing less than* a reckless disregard of the consequences of his life-threatening act. He may, however, be shown to have possessed a more blameworthy *mens rea,* such as an intent to maim, but that excess culpability will be simply surplusage as far as the reckless endangerment charge is concerned. It certainly does not operate to exculpate him of the reckless endangerment.

The *Williams* Court also said, *id.* at 495, 641 A.2d 990:

The *actus reus* of the crime of reckless endangerment is "conduct that creates a substantial risk of death or serious physical injury to another person." Md. Ann.Code art. 27, § 120(a) (1992).... [I]t is undisputed that the *actus reus* of creating a substantial risk is to be measured objectively, not subjectively. The *mens rea* of the defendant, although indispensable to an ultimate finding of guilt, has nothing to do with the establishment of the *actus reus.* Whether the conduct in issue has, indeed, created a substantial risk of death or serious physical injury is an issue that will be assessed objectively on the basis of the physical evidence in the case.

*Cf. Robinson v. State,* 307 Md. 738, 745, 517 A.2d 94 (1986) (recognizing, in regard to depraved heart murder, that the crime may be committed "absent intent to injure," but rejecting the contention that "the crime is not committed if there is an intent to injure.... The terms, 'recklessness' or 'indifference' ... do not preclude an act of intentional injury").

We next consider the offense of assault. As noted, in 1996 the Legislature enacted a new statutory scheme for assault, and abrogated the common law crimes of assault and battery. *Christian v. State,* 405 Md. 306, 317–18, 951 A.2d 832 (2008). *See also Robinson v. State,* 353 Md. 683, 694, 728 A.2d 698 (1999) (recognizing that the repeal of the existing assault provisions in 1996, coupled with the enactment of a new assault statute, "represent the entire subject matter of the law of assault and battery in Maryland, and as such, abrogate the

common law. . . .") The revised statutory scheme for assault "subsumed all previous statutory assault provisions as well as the common law into a single scheme and established a two-tiered regimen." *Id.*

With respect to the statutory assault scheme, the Court explained in *Christian,* 405 Md. at 320, 951 A.2d 832:

By its terms, viewed in the context of the applicable definition of "serious physical injury," the first degree assault statute now covers the most serious assaults, including those former aggravated assaults, whose commission ordinarily, although certainly not always, involved the commission of a battery, *e.g.,* assaults with intent to murder, maim and disfigure. Second degree assault, on the other hand, encompasses all other assaults and batteries, including those former aggravated assaults that ordinarily did not involve completed batteries, *e.g.,* assault with intent to rob, provided that no firearm was used.

Of import here, there are two distinct modalities with respect to first degree assault. In effect, the modalities are regarded as distinct statutes. *Dixon v. State,* 364 Md. 209, 243, 772 A.2d 283 (2001).

With this background, we turn to consider the merger issue. The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the states by way of the Fourteenth Amendment, *Hubbard v. State,* 395 Md. 73, 88, 909 A.2d 270 (2006), generally bars successive prosecutions and multiple punishments for the same offense. *Dixon,* 364 Md. at 236, 772 A.2d 283. *See Missouri v. Hunter,* 459 U.S. 359, 365–69, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). Conversely, "[w]here a legislature . . . specifically authorizes cumulative punishment under two statutes [that] prohibit the same conduct, such punishment may be imposed under the statutes in a single trial." *Holbrook,* 364 Md. at 369, 772 A.2d 1240. *See Missouri,* 459 U.S. at 368, 103 S.Ct. 673.

In Maryland, the authorities are legion that the "required evidence test" is generally used to determine wheth-

er two offenses arising out of the same act merge for double jeopardy purposes. *Dixon,* 364 Md. at 236–37, 772 A.2d 283; *Williams v. State,* 323 Md. 312, 316, 593 A.2d 671 (1991); *Claggett v. State,* 108 Md.App. 32, 45, 670 A.2d 1002, *cert. denied,* 342 Md. 330, 675 A.2d 992 (1996).[11] This test, which applies to both statutory and common law offenses, *Dixon,* 364 Md. at 237, 772 A.2d 283, "focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter." *State v. Lancaster,* 332 Md. 385, 391, 631 A.2d 453 (1993) (internal quotations and citations omitted). On the other hand, if each offense requires proof of a fact that the other does not, i.e., if each contains an element that the other does not, they do not merge, even if they arise from the same conduct or incident. *Holbrook,* 364 Md. at 370, 772 A.2d 1240.

According to the State, the offenses at issue here do not merge under the required evidence test, because the evidence established appellant's use of a firearm. It posits:

> Arguably, based on *Williams,* a sentence for a conviction of reckless endangerment may merge into the first form of first degree assault, that is, an assault where there is proof that the defendant intended to cause or attempt to cause serious physical injury. The same is, however, not true for the second form of first degree assault because the second form of assault requires proof of an element which reckless endangerment does not, namely the use of a firearm.

In addition, the State maintains that the offenses do not merge under the alternative ground of the rule of lenity. In this regard, it seems to suggest that the Legislature intended "multiple punishments" for the offenses at issue here.

With regard to merger of voluntary manslaughter and first degree assault under the required evidence test, the Court of

---

**11.** The required evidence test is also known as the "same evidence test," the "same elements test," and the "Blockburger test." *See Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

Appeals has recognized as significant the differences in the modalities of first degree assault. Recently, in *Christian,* 405 Md. at 306, 951 A.2d 832, the Court recognized that first degree assault, "when committed under the modality of intentionally causing or attempting to cause serious physical injury to another, is a lesser included offense of attempted voluntary manslaughter." *Id.* at 321–22, 951 A.2d 832. Therefore, those offenses merge. *Id.* However, it concluded that first degree assault by use of a firearm does not merge, because the latter offense requires the additional element of use of a handgun and is not a lesser included offense. *Id.* at 322, 951 A.2d 832.

*Dixon, supra,* 364 Md. 209, 772 A.2d 283, also provides guidance. There, a jury convicted the defendant of first degree assault, attempted voluntary manslaughter, and the use of a handgun in the commission of a crime of violence. *Id.* at 212, 772 A.2d 283. He was sentenced to twenty years for the assault; ten years, concurrent, for the attempted voluntary manslaughter; and twenty years, consecutive, for the handgun offense. *Id.* This Court reversed and remanded for a new trial. *Id.* On remand, the State nol prossed the attempted manslaughter charge over the defendant's objection, and the defendant was then convicted of first degree assault and the use of a handgun in the commission of a crime of violence. *Id.* The court sentenced him to twenty years for the assault conviction and twenty years, consecutive, for the handgun offense, despite his claim that the sentence for assault could not exceed the sentence previously imposed for attempted manslaughter. *Id.*

On appeal, the defendant argued that the assault merged into the attempted manslaughter, and thus his sentence could not exceed ten years. The Court of Appeals said: "Our analysis turns to whether the initial sentence of twenty years for first degree assault, with ten concurrent years for attempted voluntary manslaughter, was legal.[ ]" *Id.* at 228, 772 A.2d 283. After reviewing the principles of merger and the offense of attempted voluntary manslaughter at common law, the Court noted that "attempted voluntary manslaughter requires an attempted homicide in the heat of passion in response to a

legally adequate provocation." *Id.* at 238, 772 A.2d 283. In contrast, said the Court, first degree assault may be committed either by causing or attempting to cause "serious physical injury" or by use of a firearm. *Id.* at 239, 772 A.2d 283.

As to the merger issue, the Court stated, *id.* at 239, 240, 772 A.2d 283 (emphasis in *Dixon*):

> Attempted voluntary manslaughter clearly has a different required mens rea—an intent to kill—than first degree assault, which requires the specific intent to cause, or attempt to cause, serious physical injury. Upon examination of the first modality, (a)(1), of the first degree assault statute, however, it is clear that (a)(1) is *subsumed* by attempted voluntary manslaughter. Attempted voluntary manslaughter requires a specific intent to commit a homicide, which embodies an intention to cause or attempt to cause serious physical injury as required by (a)(1).
>
> * * *
>
> Thus, nothing less then [sic] an intent to kill will suffice for attempted voluntary manslaughter. The intent to kill envelops the intent to do serious physical injury. Therefore, there is nothing required by modality (a)(1) of the first degree assault statute that is not also required by attempted voluntary manslaughter; the evidence required to show an attempt to kill would demonstrate causing, or attempting to cause, a serious physical injury.

Accordingly, the Court determined that, for purposes of merger, first degree assault, when committed under the modality of intentionally causing or attempting to cause serious physical injury to another, is a lesser included offense of attempted voluntary manslaughter. *Id.* at 241, 772 A.2d 283. Conversely, the Court concluded that, when first degree assault is committed under the second modality of the statute, involving use of a firearm, it is not a lesser included offense of attempted voluntary manslaughter. *Id.* The Court reasoned that first degree assault under (a)(2) "requires proof of an element not required by attempted voluntary manslaughter," *id.* at 240–41, 772 A.2d 283, because manslaughter " 'may be

attempted by modalities or with instrumentalities other than a firearm, so there is no requirement that a firearm be used.' " *Id.* at 241, 772 A.2d 283 (quoting *Dixon v. State,* 133 Md.App. 325, 345, 755 A.2d 560 (2000)).

The *Dixon* Court then determined that, in ascertaining whether attempted voluntary manslaughter merged with first degree assault, it had to look to the first trial and "discern, if possible, under which modality of the first degree assault statute" the appellant had been convicted. *Id.* at 243, 772 A.2d 283. The Court found that the record was not clear as to the modality. *Id.* at 244, 772 A.2d 283. In this regard, it noted that the trial court had instructed the jury as to both modalities, but the verdict sheet did not ask the jury to particularize the modality. Thus, the jury returned a "general verdict." *Id.* at 248, 772 A.2d 283. Moreover, the Court noted that "the prosecutor did not place particular emphasis on the offense ... or mention either modality of the assault statute" in his opening statement, *id.* at 247, 772 A.2d 283, although the State emphasized the use of a handgun in closing. *Id.* at 248, 772 A.2d 283. Consequently, the Court could not "determine under which modality" the appellant was convicted of first degree assault; the ambiguity was resolved in the appellant's favor. *Id.* at 248–49, 772 A.2d 283. On this basis, the Court concluded that, on retrial, the court's sentence for first degree assault "should have been restricted to ten years." *Id.* at 249, 772 A.2d 283.

*Holbrook, supra,* 364 Md. 354, 772 A.2d 1240, is also noteworthy. There, the defendant was convicted, *inter alia,* of first degree arson and eight counts of reckless endangerment in connection with a fire at a home in which eight persons were present but escaped without injury. At sentencing, the defense attorney asked the court to merge the reckless endangerment convictions, but the court imposed consecutive sentences. On appeal, the defendant argued that the trial court erred in failing to merge the reckless endangerment with the first degree arson, *id.* at 360–61, 772 A.2d 1240, because " 'every first degree arson necessarily involves a reckless endangerment.' " *Id.* at 370, 772 A.2d 1240.

The Court of Appeals concluded "that arson and reckless endangerment are separate and distinct crimes," and rejected the defendant's contention. *Id.* at 364, 772 A.2d 1240. First, the Court observed that first degree arson is a specific intent crime, whereas reckless endangerment is merely a general intent crime. *Id.* at 371, 772 A.2d 1240. Second, it recognized that reckless endangerment " 'is quintessentially a crime against persons' " (citation omitted), *id.* at 371, 772 A.2d 1240, while arson is defined as a crime against habitation, not persons or property. *Id.* at 372, 772 A.2d 1240. Therefore, it disagreed with appellant's claim that the required evidence test was satisfied.

Finally, we turn to *Williams,* 100 Md.App. at 510, 641 A.2d 990, the sole case on which appellant relies. There, the defendant was convicted of assault with intent to maim under Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 3 86,[12] as well as reckless endangerment, in violation of Art. 27, § 120(a). The charges arose from a "drunken barroom fight," *id.* at 472, 641 A.2d 990, in which the appellant intervened and twice stabbed a person who was engaged in an altercation with appellant's brother. The court sentenced Williams to ten years' incarcer-

---

**12.** Article 27, § 386, which was repealed in 1996, was captioned, "Unlawful shooting, stabbing, assaulting, etc., with intent to maim, disfigure or disable or to prevent lawful apprehension." It provided as follows:

If any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or shall unlawfully and maliciously stab, cut or wound any person, or shall assault or beat any person, with intent to maim, disfigure or disable such person, or with intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained, every such offender, and every person counselling, aiding or abetting such offender shall be guilty of a felony and, upon conviction are subject to imprisonment for not more than 15 years. Article 27, § 386 derived from a statute enacted in 1853, later codified at Md.Code (1888), Art. 27, § 189. *See Christian,* 405 Md. at 315, 951 A.2d 832. This form of assault required specific intent. *Id. See also Hammond v. State,* 322 Md. 451, 453, 588 A.2d 345 (1991). As the Court noted in *Ford v. State,* 330 Md. 682, 699 n. 6, 625 A.2d 984 (1993), assault with intent to maim "may include, but [does] not require, actual battery."

ation for assault, and to a concurrent term of five years for reckless endangerment. On appeal, Williams complained that he could have been convicted and punished for either offense, but not for both. *Id.* at 473, 641 A.2d 990. He insisted that the reckless endangerment conviction should have merged.

Writing for the Court, Judge Moylan indicated that, even if the crime of reckless endangerment and "unintended battery" are distinct offenses, "multiple punishment will nonetheless be prohibited and merger will still be required in those particular instances where the inchoate crime of reckless endangerment has ripened into an instance of the consummated crime of unintended battery." *Id.* at 489, 641 A.2d 990. He added: "The crime involving potential harm will merge into the crime involving actual harm on an *ad hoc* basis, even if not as a universal principle of double jeopardy law." *Id.* at 490, 641 A.2d 990.

The *Williams* Court observed that the crime of reckless endangerment may move "along the line of an escalating *mens rea*...." *Id.* at 490, 641 A.2d 990. The Court elaborated, *id.*

> To move from reckless endangerment, where one is simply indifferent to the threat to the victim, to one of the more malicious crimes where death or serious bodily harm is affirmatively desired or specifically intended—such as attempted murder, attempted manslaughter, attempted mayhem, assault with intent to murder, assault with intent to maim, etc.—primarily involves racheting the *mens rea* up to the next level of blameworthiness.

In this context, the *Williams* Court addressed "whether the *mens rea* of reckless endangerment is a lesser included mental state that may merge into the more blameworthy *mens rea* of assault with intent to maim, etc. (or assault with intent to murder or attempted murder or attempted manslaughter or attempted mayhem, etc.)...." *Id.* at 491, 641 A.2d 990. The Court said, *id.* at 501, 641 A.2d 990:

> It is undisputed that a specific intent to do harm is not part of the *mens rea* of reckless endangerment. Maryland's reckless endangerment statute, as all reckless endanger-

ment statutes, spells out expressly what the *mens rea* of the crime is. It is required that the defendant's conduct be "reckless." "Reckless" describes a mental state or a *mens rea*. Before inquiring further into what that *mens rea* is, it is appropriate to state what it is not. It is not a specific intent to inflict harm.

Further, the *Williams* Court said, *id.* at 510, 641 A.2d 990:

[T]he subjective *mens rea* of reckless indifference to a harmful consequence at a certain point along the rising continuum of blameworthiness may ripen into the even more blameworthy specific intent to inflict the harm. At that point, the lesser included offense of reckless endangerment merged into the greater inclusive offense of assault with intent to maim. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

Thus, the Court concluded that the appellant "was guilty of a single criminal act in the course of a single criminal episode," and held that the conviction for reckless endangerment merged into the conviction for assault with intent to maim. *Id.* at 472, 641 A.2d 990.

▇▇▇ From these cases, we glean that reckless endangerment under C.L. § 3–204 may merge with first degree assault under C.L. § 3–202(a)(1), involving the conduct of causing or attempting to cause serious physical injury to another, when the mens rea and the actus reus of reckless endangerment ripen into the specific intent to cause or attempt to cause serious physical injury. In that circumstance, reckless endangerment might be a lesser included offense under C.L. § 3–204(a)(1).

▇▇▇ The question remains whether this case involved a first degree assault conviction under C.L. § 3–202(a)(2) and, if so, whether reckless endangerment merges into the crime of first degree assault when the modality of the assault is the use of a firearm. *Williams* did not address that issue.

▇▇▇ We are satisfied that appellant's assault conviction was predicated on C.L. § 3–202(a)(2). As indicated,

Williams's medical records, admitted by stipulation, coupled with the testimonial evidence, unequivocally established that Williams sustained a gunshot injury to his back. The court, as fact finder, was fully aware of both modalities of first degree assault; a judge is presumed to know the law. *State v. Chaney,* 375 Md. 168, 181, 825 A.2d 452 (2003).

 Here, the State proved first degree assault by use of a firearm, in violation of C.L. § 3–202(a)(2). The assault is of the variety commonly called a battery, i.e., an offensive or unlawful touching.[13] *See Claggett,* 108 Md.App. at 47, 670 A.2d 1002 (defining battery as a harmful, unlawful, or offensive touching); *Wieland v. State,* 101 Md.App. 1, 27, 643 A.2d 446 (1994) (defining battery as an offensive touching). As Judge Moylan observed for the Court in *Wieland,* "A consummated intentional battery requires a general intent on the part of the perpetrator to hit the victim." *Id.* at 40, 643 A.2d 446. Similarly, "[a]n attempted battery (assault) requires the same general intent to hit the victim and, therefore, to perpetrate the battery."

 In order to prove the crime of reckless endangerment, the evidence must show that the defendant engaged in conduct that created a "substantial risk of . . . serious physical injury," C.L. § 3–204(a)(1), and that the defendant "consciously disregarded" that risk. *Wieland,* 101 Md.App. at 28, 643 A.2d 446. As the *Wieland* Court recognized, "deliberately firing a bullet into the torso of another person could be deemed to create 'a substantial risk of death or serious physical injury to another person.'" *Id.* Moreover, "even brandishing a loaded and cocked weapon in the direction of another person" could constitute the crime of reckless endangerment. *Id.*

Notably, proof of use of a firearm is not required to establish reckless endangerment. Conversely, conduct that creates a substantial risk of serious physical injury to another,

---

**13.** Despite the legislative change in 1996, discussed earlier, and as we have noted, assault is defined to include a battery. *See* C.L. § 3–201(b).

coupled with a conscious disregard of that risk, are elements distinct from first degree assault by use of a firearm; the latter offense does not require a conscious disregard of the risk of serious physical injury. Because each offense at issue here contains elements not required for conviction of the other, they do not merge under the required evidence test.

That is not the end of our analysis, however, because the required evidence test is only one of the standards used to resolve questions of merger. *Dixon,* 364 Md. at 250 n. 38, 772 A.2d 283; *Williams,* 323 Md. at 320–21, 593 A.2d 671; *Claggett,* 108 Md.App. at 51, 670 A.2d 1002. Even if two offenses do not merge under the required evidence test, merger for purposes of sentencing may be appropriate under the rule of lenity or based on principles of fundamental fairness.

The "rule of lenity" is a principle of statutory construction. *See White v. State,* 318 Md. 740, 744, 569 A.2d 1271 (1990), *superseded on other grounds by statute,* C.L. § 3–602, *as recognized in Tribbitt v. State,* 403 Md. 638, 652–53, 943 A.2d 1260, *cert. denied,* —— U.S. ——, 129 S.Ct. 132, 172 L.Ed.2d 38 (2008); *Miles v. State,* 349 Md. 215, 227, 707 A.2d 841 (1998); *Claggett,* 108 Md.App. at 51, 670 A.2d 1002. It amounts to an alternate basis for merger in cases where the required evidence test is not satisfied, and is applied to resolve ambiguity as to whether the Legislature intended multiple punishments for the same act or transaction. *White,* 318 Md. at 744, 569 A.2d 1271. *See, e.g., Haskins v. State,* 171 Md. App. 182, 193–94, 908 A.2d 750 (2006); *Marquardt v. State,* 164 Md.App. 95, 149, 882 A.2d 900 (2005). The doctrine is applicable even if one offense is statutory and the other is a common law crime. *Williams,* 323 Md. at 321, 593 A.2d 671.

In *Monoker v. State,* 321 Md. 214, 222, 582 A.2d 525 (1990), the Court of Appeals explained:

Even though two offenses do not merge under the required evidence test, there are nevertheless times when the offenses will not be punished separately. Two crimes created by legislative enactment may not be punished separately if

the legislature intended the offenses to be punished by one sentence. It is when we are uncertain whether the legislature intended one or more than one sentence that we make use of an aid to statutory interpretation known as the "rule of lenity." Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge.

The *Holbrook* Court, discussed earlier, rejected the claim of merger of reckless endangerment and arson under the rule of lenity. Noting that the Legislature had moved the offense of reckless endangerment to the Assault subtitle, the Court stated that, even if the occupants of the home had been injured, the crime of reckless endangerment nonetheless "would not have ripened into the offense of arson, but rather into the offense of battery, or worse. It, however, would not have ripened under the rule of lenity into the offense of arson." 364 Md. at 374, 772 A.2d 1240.[14]

*State v. Jenkins,* 307 Md. 501, 515 A.2d 465 (1986), is also instructive. There, the Court considered whether a defendant could receive separate sentences for two aggravated assaults that violated two separate statutes (Art. 27, § § 12 and 386). Both convictions were based on one assaultive act of shooting. While the Court determined that the intent elements of assault with intent to murder and assault with intent to maim were inconsistent, it concluded that the *offenses* were not necessarily inconsistent. *Id.* at 515–16, 515 A.2d 465. The Court reasoned that the General Assembly did not intend the imposition of separate sentences based on a single assaultive act. *Id.* at 517, 515 A.2d 465. Accordingly, the Court concluded that the conviction for assault with intent to maim merged into the conviction for assault with intent to murder. In this regard, the Court said, *id.* at 521, 515 A.2d 465 (emphasis added):

---

**14.** The Court declined to address merger under the doctrine of fundamental fairness, because it was not argued to this Court or raised in the petition for certiorari. *Id.* at 375, 772 A.2d 1240.

We agree that assault with intent to murder and assault with intent to maim, disfigure or disable, when based on the *same single act of assault* [i.e. shooting] should not be viewed as entirely separate crimes for purposes of conviction and sentence. Rather, as the courts generally hold, one aggravated assault should be viewed as merging into the other aggravated assault.

With respect to principles of fundamental fairness, the Court said in *Williams,* 323 Md. at 324, 593 A.2d 671: "Considerations of fairness and reasonableness reinforce our conclusion [to merge]." What the Court said in *White,* 318 Md. at 745–46, 569 A.2d 1271 (citations omitted), is also pertinent:

Other considerations may also be applicable in arriving at a principled decision. . . . We have also looked to whether the type of act has historically resulted in multiple punishment. The fairness of multiple punishments in a particular situation is obviously important.

*Manokey v. Waters,* 390 F.3d 767 (4th Cir.2004), *cert. denied,* 544 U.S. 1034, 125 S.Ct. 2272, 161 L.Ed.2d 1061 (2005), a federal habeas corpus case, is also noteworthy. Manokey was tried in 1998 in a Maryland court on various charges relating to the stabbing of his former girlfriend, including first-degree assault and reckless endangerment. *Id.* at 769. At trial, the court dismissed, *inter alia,* the reckless endangerment count pursuant to the defendant's motion for judgment. *Id.* The defendant was subsequently convicted of first degree assault, which this Court affirmed in an unreported opinion. *Id.* In State post-conviction proceedings, Manokey claimed that the trial court's dismissal of the reckless endangerment charge barred his conviction for first degree assault based on double jeopardy, because they were the same offense. *Id.* The State circuit court concluded that the offenses were not the same, and therefore the acquittal on reckless endangerment did not bar the assault conviction. *Id.* at 770. Thereafter, in his federal habeas case, Manokey relied on *Williams, supra,* 100 Md.App. 468, 641 A.2d 990, and argued that the State court erred. *Id.*

The United States Court of Appeals for the Fourth Circuit considered whether the reckless endangerment and assault charges were sufficiently similar under Maryland law so as to bar prosecution for assault based on principles of double jeopardy. In that posture, it examined *Williams,* 100 Md. App. at 510, 641 A.2d 990, and observed, 390 F.3d at 770–71:

> *Williams* is not a double-jeopardy case. Instead, it involves an application of the common-law merger doctrine for purposes of sentencing. As in the present case, in *Williams* the charges arose from the same incident; the defendant had been convicted of both (1) assault with intent to maim and (2) reckless endangerment, and he had been sentenced on each conviction, the sentences to run concurrently. . . . [T]he court held that for sentencing purposes the crime of reckless endangerment merged with the crime of assault with intent to maim. Having so held, the court affirmed the sentence for assault with intent to maim (ten years) and vacated the concurrent sentence for reckless endangerment (five years). *Williams* does not say, nor, as far as we know, has any Maryland state court ever said, that the granting of a judgment of acquittal of a reckless-endangerment charge results in a double jeopardy bar against trial and conviction on either an assault-with-intent-to-maim charge or a first-degree-assault charge.[ ]

Further, the *Manokey* Court reasoned, *id.* at 771:

> The *Williams* holding on merger of the two crimes for sentencing purposes thus is not controlling on the double-jeopardy issue presented by Manokey. The question is not whether first-degree assault and reckless endangerment merge as a matter of state law for sentencing purposes when both charges are based on the same incident but whether the granting of a motion for a judgment of acquittal on the reckless-endangerment charge results in a double-jeopardy bar against trial and conviction on the first-degree-assault charge. Under *Blockburger,* the answer depends on whether each crime requires an element of proof the other crime does not. We believe that a proper *Blockburger*

analysis of the two crimes supports the state ... court's denial of Manokey's double-jeopardy claim.[15]

Nevertheless, and of import here, the Fourth Circuit said, *id.:*

Implicit in this reasoning is the idea that when a single act is sufficient to result in convictions for both offenses, but the victim suffered only a single harm as a result of that act, then as a matter of fundamental fairness there should be only one punishment because in a real-world sense there was only one crime.

Here, the use of the firearm spawned multiple charges against appellant. Yet, the evidence at trial pertained solely to a single act of shooting a single victim. Marlin's conduct as to the reckless endangerment involved the same conduct that formed the basis for the first degree assault by firearm; no other conduct was involved in proving either offense.

In our view, under principles of fundamental fairness or the rule of lenity, the singular act of shooting Williams properly resulted in two convictions but warranted only one sentence. Accordingly, we conclude that the trial court erred when it failed to merge appellant's sentence for reckless endangerment with his sentence for first degree assault.

**SENTENCE FOR RECKLESS ENDANGERMENT VACATED. JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY OTHERWISE AFFIRMED. COSTS TO BE PAID ONE–HALF BY APPELLANT, ONE–HALF BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

**15.** The Fourth Circuit noted, *id.* at 771, that *Williams* did not "purport to do a complete *Blockburger*-type analysis of assault with intent to maim and reckless endangerment. Instead, the opinion merely compares the *mens rea* of the two offenses and does not compare other elements of the offenses that might differentiate them for double-jeopardy purposes. The holding of *Williams* is thus a far cry from a holding that the offenses are the same for double-jeopardy purposes."